UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JASON HAMMETT,                    )
                                  )
          Plaintiff               )
                                  )
vs.                               )        Case No.  5:19-cv-01918-HNJ
                                  )
46 ENTERTAINMENT, INC.,           )
                                  )
          Defendant               )

## MEMORANDUM OPINION

Plaintiff, Jason Hammett, asserts claims against Defendant, 46 Entertainment, Inc., for negligence and wantonness, arising from injuries he sustained while unloading equipment from a truck for a music festival.[1]  46 Entertainment filed a motion for summary judgment on both of Hammett's claims.  (Doc. 30).  As elaborated below, the undisputed material facts do not demonstrate that 46 Entertainment owed Hammett a duty to provide a safe work environment or to warn him of any potential workplace hazards.  Accordingly, Hammett cannot succeed on his negligence and wantonness claims, and the court will grant 46 Entertainment's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant

---

[1] Federal jurisdiction rests upon satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332(a).   Plaintiff resides in Alabama, Defendant is a Tennessee corporation with its principal place of business in Tennessee, and the amount in controversy exceeds $75,000.  (Doc. 1, ¶¶ 1-3).

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).   The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).  In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not

significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## SUMMARY OF FACTS

The Rock the South music festival ("the festival") takes place each summer in Cullman, Alabama. (Doc. 32-5, at 12). Rock the South, LLC, owned, operated, and produced the festival in 2018. At that time, two entities comprised Rock the South, LLC's members: GSR Events, LLC (75% owner) and 46 Entertainment, Inc. (25% owner). Nathan Baugh, 46 Entertainment's owner, testified 46 Entertainment did not qualify with the Alabama Secretary of State to conduct business within the state, as the entity performed all its work related to the festival through Rock the South, LLC, which possessed the necessary qualification and licenses. (Doc. 32-5, at 5-7, 16-17, 20; Doc. 32-2, at 32-33).

To construct the stage and lighting for the festival, Rock the South, LLC, contracted with Premier Global Productions ("Premier"). (Doc. 32-5, at 26, 29). Baugh directed Premier where to place the center stage point, and Premier constructed the stage from that point. After providing that direction, Baugh had no further involvement with constructing the stage. (*Id.* at 30). Premier arranged transportation

for some artists' stage equipment, but other artists arranged the transportation for their own equipment. (*Id.* at 29).

The local chapter of the International Alliance of Theatrical Stage Employees ("IATSE" or "the Union") provided the labor necessary to unload each artist's equipment and install it on the performance stage. The Union employed all truck loaders and stage hands, and it paid those employees from the proceeds of a contract with the festival. (Doc. 32-5, at 27, 30, 42; Doc. 32-2, at 3; Doc. 32-3, at 6). Hiring Union workers provided a benefit to the festival because the workers possessed experience in the theatrical stage industry. (Doc. 32-5, at 38).

Scott Bullard, an employee of both 46 Entertainment and Rock the South, LLC, worked as the site manager for the 2018 festival. In that role, Bullard managed vendors, interactions with police and fire fighters, and traffic. Rock the South, LLC, reimbursed 46 Entertainment for the cost of Bullard's services relating to the festival. Bullard worked at the festival site, but he did not perform any hands-on duties regarding labor during the festival. (*Id.* at 13-15, 42-43). However, as discussed more fully below, approximately one month before the festival began Bullard queried the Union regarding labor costs so as to obtain rough expense estimates for the budget, and he participated in negotiations with the Union regarding labor costs. (*Id.* at 42, 44).

Jerry Holcomb served as a production manager during the 2018 festival. (*Id.* at 39). He did not work directly for either 46 Entertainment or Rock the South, LLC. Rather, he freelanced as a stage manager for various festivals and arena tours, and Rock

the South, LLC, contracted with him to manage production for the 2018 festival. (*Id.* at 47, 58). The record includes a copy of a check from Rock the South, LLC, to Holcomb compensating him for his services during the 2018 festival. (Doc. 32-2, at 8).

As production manager, Holcomb managed the timing of each artist's delivery of equipment to the stage. (Doc. 32-5, at 39, 47). However, industry standards dictated that a production manager typically did not personally participate in unloading equipment from an artist's truck. Rather, the artists' transportation crews oversaw the unloading of their own trucks, and the production manager communicated with the Union steward regarding any issues with the stage hands. (*Id.* at 39, 48).

Steve Roman also served as a production manager during the 2018 festival. (Doc. 32-4, at 12, 55). Plaintiff testified that 46 Entertainment employed Roman, but he later clarified that he based that statement on an assumption stemming from Roman and Holcomb's presence on site to direct the unloading activities during the entire festival. (*Id.* at 12, 58). No one told Hammett that 46 Entertainment employed either Holcomb or Roman, and he did not see either man wearing a uniform or name tag indicating their employment. (*Id.* at 58).

Baugh attested that neither 46 Entertainment nor Rock the South, LLC, employed Roman. Rather, Rock the South, LLC, paid Roman as an independent contractor for his work at the festival. (Doc. 32-2, at 6). The record includes a copy of a check from Rock the South, LLC, to Roman, compensating him for his services during the 2018 festival. (*Id.* at 9).

In 2018, Plaintiff, Jason Hammett, enjoyed sixteen years of experience as a stage hand and twelve years of Union membership.  During those years, he worked hundreds of music festivals.  Industry practice dictated that when the producers of an event needed truck loaders or stage hand labor, they contacted the Union, and the Union assigned workers to the job according to their seniority within the Union.  (Doc. 32-4, at 9, 18; Doc. 34-6, ¶¶ 3-4, 7).

Hammett testified that 46 Entertainment hired the workers for the 2018 festival through the Union.  (Doc. 32-3, at 6).  Bullard contacted a Union representative on May 3, 2018, with a projection of the number of Union employees the festival would require and a proposal for the cost of their salaries.  The negotiations between Bullard and the Union representative continued through May 22, 2018, when the two men reached an agreement.  Bullard next emailed the Union representative in the early morning hours of June 1, 2018, the first day of the festival, to confirm a detail of their arrangement.  On June 5, 2018, the Union sent Bullard a bill for all the labor services for the 2018 festival. (Doc. 32-5, at 43-47; Doc. 34-2).  According to Baugh, Bullard maintained no involvement in engaging or managing Union laborers beyond what his email communications suggest, as Holcomb took over those duties on approximately May 22, 2018.  (Doc. 32-5, at 43, 47).

Hammett worked as a member of a four-person crew unloading artists' tractor-trailer trucks on June 1 and 2, 2018.  (Doc. 32-4, at 18).  On June 2, 2018, Hammett and his crew worked a ten-hour shift, from 7:00 a.m. to 5:00 p.m.  (*Id.* at 18, 38).  Their

duties for that day consisted solely of unloading items from trucks onto the loading dock. (Doc. 34-6, ¶ 18). Premier provided two flatbed trailers to serve as a loading dock for the stage, in conformance with standard industry practice. Trucks carrying artists' equipment would pull up to the loading dock, where Union truck loaders would unload the trucks, and other workers would transport the equipment across the loading dock to the stage. (Doc. 32-5, at 34-35).

David Jerkins, the Union steward, served as both a member and supervisor of Hammett's four-person crew on June 2, 2018, as the festival did not pay the extra wages for a designated steward who performed only supervisory duties. (Doc. 32-4, at 25; Doc. 34-6, ¶¶ 19-20). Jerkins decided when the Union workers could take a break, but Roman and Holcomb otherwise "were the ones that were in charge telling [the Union workers] what to do." When Roman or Holcomb needed stage hands or loaders for a particular task, they would communicate that need to Jerkins, and Jerkins would designate which workers would complete that project. (Doc. 32-4, at 25, 27).

Either Roman or Holcomb directed Hammett's unloading crew to prepare to unload the first truck at 7:00 a.m., but they did not begin unloading until sometime between 7:20 and 7:30 a.m. (*Id.* at 18, 38-39). As a result of the late start, Roman yelled a great deal during the unloading process and rushed the truck loaders to complete their work. (*Id.* at 12-13, 29, 55).

A crew of approximately 15 local inmates arrived on the work site, and Holcomb informed the Union crew that the inmates would assist them by pushing equipment

across the loading dock from the truck to the stage, at which point the stage hands could place it on the stage. (*Id.* at 39). Either Holcomb or Roman instructed the inmates exactly where to transport the items they received from the truck. (*Id.* at 39-40, 53). The inmates did not assist with unloading on Friday; they only worked on Saturday, the second day of the festival and the day of Hammett's injury. (*Id.* at 40). Prior to June 2, 2018, Hammett had never worked directly with an inmate crew on any production. (Doc. 34-6, ¶ 21).

The union crew partially unloaded the first truck, then began unloading a second truck containing stage equipment for the evening's headlining performer, country music artist Eric Church. (Doc. 32-4, at 40-41). The driver of Eric Church's truck participated in the unloading process by unstrapping the equipment inside the trailer and handing it over to the Union crew to remove from the truck. The driver remained in the truck with the four-person Union crew throughout the unloading process. In Hammett's experience, a department head from the stage construction department also typically provided direction to Union crews while they unloaded trucks, but no such department head participated in the June 2, 2018, unloading. (*Id.* at 23-24, 26-27, 55).

Two members of the Union crew installed a four-foot-wide-by-six-foot-long aluminum ramp between the truck and the loading dock while Hammett observed, and the crew confirmed the ramp "had been put in place properly." (*Id.* at 42-43). Hammett could not recall whether the ramp came with the truck, or whether the crew obtained it from the loading dock. (*Id.* at 42). Baugh testified the ramp did not belong to either

Rock the South, LLC, or 46 Entertainment, but he did not know definitively who provided it. (Doc. 32-5, at 10, 36; Doc. 32-2, at 4). The truck sat at a distance of approximately two feet away from the loading dock, and approximately one foot lower than the dock, so the ramp inclined "at a steep angle." (Doc. 32-4, at 42). The ramp did not attach to either the truck or the loading dock, but it nonetheless remained in place and did not move around. (*Id.* at 43-44).

The equipment in Church's truck rested on approximately 30 four-foot-high-by-six-foot-wide rolling carts constructed from square steel tubing with open sides (so the crew could see the contents of each cart). The Union crew unloaded approximately half the carts prior to Hammett's injury. They then began to unload a cart containing drum risers, pieces of equipment on which a musician's drum set rests to elevate it on the stage. (*Id.* at 41-42).

Each cart with its contents weighed approximately 400-600 pounds. The wheels on each cart fit onto the ramp, but the width of the carts themselves exceeded the width of the ramp. Therefore, no one could walk beside the cart to guide it up the ramp. Rather, two crew members had to situate themselves behind the cart inside the truck to push it up the ramp, and the two others situated themselves in front of the cart, on the ramp, to guide the cart upward. Because of the incline of the ramp and the weight of the carts, the unloaders in charge of pushing had to rely upon momentum to force the carts up the ramp and onto the loading dock. (*Id.* at 44-45).

Two metal load bars extended the width of the rear opening of Eric Church's trailer, approximately two feet inward from the rear opening and one foot down from the ceiling of the trailer.  The bars, which served the purpose of securing the truck's contents during transport, were removable, but the truck arrived at the festival with the bars attached.  Six-inch-wide heavy plastic strips affixed to the load bar typically hung down to the floor of the trailer, but they all did not hang down on this occasion as someone had wrapped some of the strips around the load bar before the truck arrived. The remaining hanging strips hit the crew members each time they pushed a cart up the ramp, causing discomfort and distraction.  (*Id.* at 46-48).

At some point, Hammett observed two of his crew mates wrapping the remaining plastic strips around the load bar so the straps would no longer hit them while unloading.  Hammett asked the truck driver if the crew should remove the load bar, but the driver instructed the crew to leave the bar in place.  However, the driver did not object to the crew wrapping the strips around the bar, and neither did Roman, who observed the entire unloading process.  (*Id.* at 48-49, 57).  Baugh testified that pursuant to standard industry practice, either the truck driver or the unloading crew typically would remove a load bar before unloading a truck.  (Doc. 32-5, at 11).

After wrapping the remainder of the plastic straps around the load bar, the crew began to unload a cart with a set of three-to-four-feet-tall aluminum stairs sitting on top, covering the entire top of the cart.  They pushed the cart to the opening of the truck, then Hammett and one other crew member began to push the cart up the ramp

with the stairs still on top.  (Doc. 32-4, at 49-51).  Up to this point, the stairs did not feel unstable or shift around on top of the cart, though no straps or ties affixed the stairs to the cart.  (*Id.* at 51, 53).  Hammett curved his hands over the top of the cart's steel tubing frame at chest height, approximately four inches above the top of the cart's contents, and he leaned into the cart to push it up.  He could see the tall side of the steps at the end of the cart he was pushing, but he could not see the load bar at the top end of the truck.  As the cart ascended the ramp, the aluminum stairs on top of the cart collided with the load bar.  The force of that collision pushed the stairs back onto Hammett's hands, severing the tip of his left index finger.  (*Id.* at 13, 51, 53).  Both Roman and Holcomb stood on the loading dock at the time of Hammett's injury.  (Doc. 34-6, ¶ 16).

Hammett had moved a cart with a set of stairs on top of it before, but he had not done so very often.  He testified that "[a] lot of times we would carry the steps out, or they would tell us to carry the steps out or the steps would be inside of a square tube that you don't have to even mess with the steps at all."  (Doc. 32-4, at 56).  He also testified that if his crew had noticed that the stairs came close to colliding with the load bar, they would have stopped the cart and hand carried the stairs.  (*Id.* at 57).  In addition, at every other festival Hammett had worked, the loading dock sat at the same height as the trailers he unloaded, thereby allowing the use of a flat loading ramp called a "dock plate," rather than an inclined ramp.  Workers could face forward when using a dock plate to unload, whereas they needed to walk backward and could not see in the

direction they walked while using the incline ramp during the 2018 festival.  (Doc. 34-6, ¶¶ 9-15).

## DISCUSSION

### I.     Hammett's Negligence Claim Cannot Survive Summary Judgment Because No Reasonable Juror Could Conclude 46 Entertainment Owed Hammett a Duty of Care

To survive 46 Entertainment's motion for summary judgment on his negligence claim, Hammett must demonstrate that a reasonable juror could find 46 Entertainment owed him a duty of care but breached that duty, thereby causing his injury.  *See Aliant Bank, a Div. of USAmeribank v. Four Star Investments, Inc.*, 244 So. 3d 896, 907 (Ala. 2017) (citations omitted) (elements of negligence include "a duty, a breach of that duty, causation, and damage."); *Sessions v. Nonnenmann*, 842 So. 2d 649, 651 (Ala. 2002) ("In [a] premises-liability case, the elements of negligence are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages.") (alteration in original) (citations and internal quotation marks omitted).

The court determines, as a matter of law, the extent of one party's duty to another.  *See Aliant Bank*, 244 So. 3d at 908 (citing *Ex parte BASF Constr. Chems., LLC*, 153 So. 3d 793, 801-02 (Ala. 2013) ("The determination whether a duty exists is generally a question of law for the court to decide.").

> "'Where the facts upon which the existence of a duty depends[] are disputed, the factual dispute is for resolution by the jury.'" [*Alabama Power Co. v. Brooks,* 479 So. 2d 1169, 1175 (Ala. 1985)] (Quoting *Alabama Power Co. v. Alexander,* 370 So. 2d 252, 254 (Ala. 1979)).  Conversely, when the facts upon which the existence of a duty depends are not genuinely

disputed, the task remaining is simply for the court to determine whether the alleged duty arises from those facts.

*Ex parte BASF Const. Chemicals, LLC*, 153 So. at 804.

Hammett's complaint alleged that 46 Entertainment owed him the following duties:

> a.      To provide and maintain a reasonably safe area for workers which included Hammett, in areas where Hammett carried out its work in performing its maintenance [*sic*] contract, and where Hammett and employees of other contractors were present as part of their on-the-job duties;
>
> b.      To warn workers about dangerous or unsafe conditions in the area where Hammett worked that it knew, or should have known; and
>
> c.      To warn workers of dangerous or unsafe conditions in the area where Hammett worked that [46 Entertainment] created and had knowledge of or in the exercise of reasonable care would have known.

(Doc. 1, ¶ 17).  As discussed more fully below, the evidence does not demonstrate 46 Entertainment owed Hammett any of those duties.

> **A.      46 Entertainment Did Not Owe Hammett a Duty to Provide a Safe Work Environment Because 46 Entertainment Did Not Employ Hammett or Retain Control Over the Manner in Which He Performed His Work**

The Alabama Code provides that each employer shall

furnish employment which shall be reasonably safe for the employees engaged therein and shall furnish and use safety devices and safeguards and shall adopt and use methods and processes reasonably adequate to render such employment and the places where the employment is performed reasonably safe for his employees and others who are not trespassers, and he shall do everything reasonably necessary to protect the life, health and safety of his employees and others who are not trespassers.

Ala. Code § 25-1-1(a).  However,

> the owner of premises . . . generally does not owe a duty to the employees of an independent contractor with respect to work conditions. *See Weeks v. Alabama Electric Cooperative, Inc.,* 419 So. 2d 1381 (Ala. 1982); *Pate v. United States Steel Corp.,* 393 So. 2d 992 (Ala. 1981); *Hughes v. Hughes,* 367 So. 2d 1384 (Ala. 1979).  There are exceptions, of course.  As was stated in *Weeks:*
>
>> "'The general rule does not apply, however, if the premises owner retains or reserves the right to control the manner in which the independent contractor performs its work.' *Thompson v. City of Bayou La Batre,* 399 So. 2d [292] at 294 [(Ala. 1981)]; *Hughes v. Hughes,* 367 So. 2d at 1386. 'When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant.' [*Thompson,*] 399 So. 2d at 294.
>>
>> "*A master-servant relationship is not created, however, when the owner merely retains the right to supervise or inspect work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications, and retains the right to stop work that is not properly done. Pate v. United States Steel Corp.,* 393 So. 2d at 995."
>
> *Weeks,* 419 So. 2d at 1383. (Emphasis added.) *See also, Alabama Power Co. v. Smith,* 409 So. 2d at 764.

*Kendrick v. Alabama Power Co.*, 601 So. 2d 912, 914 (Ala. 1992) (alterations and emphasis in original).

Hammett does not assert that 46 Entertainment employed him to work at the festival; rather, he concedes the Union employed him, and he worked at the festival in the capacity of an independent contractor.  (Doc. 33, at 12).  Therefore, 46 Entertainment owed Hammett a duty to provide safe work conditions only if it

contracted the Union to provide labor, including Hammett's, and it reserved the right to control the manner in which Hammett performed his work.

A reasonable juror could conclude 46 Entertainment contracted with the Union to provide labor for the festival. Though Rock the South, LLC, produced the festival, Hammett testified 46 Entertainment hired truck loaders and stage hands through the Union. Moreover, Scott Bullard, an employee of both 46 Entertainment and Rock the South, LLC, participated in negotiating the Union contract. 46 Entertainment asserts Bullard's participation consisted only of obtaining rough preliminary estimates for labor costs, but a reasonable juror could conclude he actually engaged the union workers on behalf of 46 Entertainment, as Bullard communicated with the Union representative by email on the first day of the festival, and the Union sent Bullard a bill for the labor services it provided.

To assess whether an entity retains control over the actions of an independent contractor's employees, courts typically analyze both the language of the parties' contract and the parties' behavior. *See Bolin v. Superior Well Servs. Inc.*, No. 7:08-CV-01100-SLB, 2011 WL 13137949, at *10 (N.D. Ala. Aug. 17, 2011) (citing *Pugh v. Butler Telephone Co.*, 512 So. 2d 1317, 1318 (Ala. 1987); *Tittle v. Alabama Power Co.*, 570 So. 2d 601, 603 (Ala. 1990); *Weeks*, 419 So. 2d at 1383) ("The Alabama Supreme Court has repeatedly held that to determine whether an owner-independent contractor relationship is converted to that of master-servant, courts must analyze 'the written contract and the actions of the parties pursuant to the contract.'"). Here, neither party

submitted a copy of the Union labor contract, so the court must assess the parties' actions pursuant to the contract.

There exists no evidence that Bullard experienced direct interactions with the Union workers after negotiating for their employment during their festival. However, a reasonable juror could conclude that Steve Roman and Jerry Holcomb exerted control over the manner in which the Union employees, including Hammett, performed their work. Hammett testified Roman and Holcomb "were the ones that were in charge telling [the Union workers] what to do." Roman and Holcomb informed the Union steward when they needed workers to complete a task and directed workers when to begin unloading trucks. Roman yelled at the Union workers to hurry their work when the schedule fell behind, and Holcomb instructed the Union workers to hand off items from the truck to the inmate crew on the loading dock. *See Bolin,* 2011 WL 13137949, at *10-12 (company exercised control over independent contractor's employees when it dictated the materials they should use and the manner in which they used those materials, and a company employee remained at the work site providing more than just compliance oversight); *Mead Coated Bd., Inc. v. Dempsey,* 644 So. 2d 872, 875 (Ala. 1994) (company exercised control over independent contractors by informing them when and under what conditions to load their trucks); *Tittle,* 570 So. 2d at 604, 608 (company exercised control over independent contractor's employees when it "gave [them] instructions . . . regarding how to perform their work"); *Miller v. Degussa Corp.,* 549 So. 2d 454, 456 (Ala. 1989) (company exercised control over independent contractor's

employees when it instructed them "how to perform their work, when to perform their work, and when to begin and end their work"); *Alabama Power Co. v. Jarman,* 549 So. 2d 7, 9 (Ala. 1989) (Alabama Power exercised control over an independent contractor's employee when it provided the scaffold from which he fell while welding, instructed him "how to cut the metal and what instrument to use," and "changed the procedure by which [he] was welding").  Moreover, Roman observed the entire unloading process, and both Roman and Holcomb stood on the loading dock at the time of Hammett's injuries.[2]

However, despite Roman and Holcomb's retention of control over the Union employees' activities, there exists no evidence that 46 Entertainment employed or engaged either Roman or Holcomb.  First, the uncontroverted evidence demonstrates Holcomb worked as a freelance production manager, and Rock the South, LLC, contracted with Holcomb to provide services during the 2018 festival.  A copy of a check from Rock the South, LLC, to Holcomb confirms that arrangement.

As for Roman, Hammett initially testified 46 Entertainment employed Roman, but he later clarified he based that statement on an assumption stemming from Roman and Holcomb's presence on site to direct the unloading activities, not on any actual

---

[2] Roman and Holcomb's presence on the loading dock would not suffice on its own to establish their control over the Union workers, as merely supervising work or inspecting for compliance does not create a master-servant relationship.  *See Kendrick v. Alabama Power Co.*, 601 So. 2d 912, 914 (Ala. 1992); *Pate v. United States Steel Corp.,* 393 So. 2d 992 (Ala. 1981); *Weeks v. Alabama Electric Cooperative, Inc.,* 419 So. 2d 1381 (Ala. 1982).  However, combined with the other evidence of control discussed above, Roman and Holcomb's presence on the loading dock bars some relevance.

knowledge of Roman's employment status.  Hammett acknowledged that he did not see Roman wearing a 46 Entertainment uniform or name tag, and no one told him Roman worked for 46 Entertainment.  To the contrary, Baugh affirmatively attested that Roman did not work for either 46 Entertainment or Rock the South, LLC, and a copy of a check from Rock the South, LLC, to Roman confirms Baugh's statement that Rock the South, LLC, contracted and paid for Roman's services.   In light of 46 Entertainment's affirmative evidence that it did not employ Roman, Hammett's assumption regarding Roman's employment does not create a genuine dispute of material fact.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *United States v. Jenkins*, 779 F.2d 606, 615-16 (11th Cir. 1986) (rejecting a witness's "assumption [that] was not based on any personal knowledge of what transpired, but sheer presumption and conjecture"); *O'Donnell v. Derrig*, 346 F. App'x 385, 389 (11th Cir. 2009) (witness's assumption did not suffice to establish a genuine issue of material fact to defeat summary judgment); *Brandon v. GlaxoSmithKline, LLC*, No. 7:15-CV-01804-RDP, 2017 WL 2876184, at *5 (N.D. Ala. July 6, 2017) (citations omitted) ("It is well settled that testimony based on an individual's belief or speculation is not competent summary judgment evidence because such testimony is not based on personal knowledge.").  Consequently, if Roman and Holcomb exercised control over Hammett and the other Union employees, they did so on behalf of Rock the South, LLC, not on behalf of 46 Entertainment, the entity Hammett sued.

The court notes Hammett cannot hold 46 Entertainment liable for Roman and Holcomb's actions simply because 46 Entertainment is a member of Rock the South, LLC, the entity that contracted for Roman and Holcomb's services during the festival. Such a result would frustrate the protection from personal liability that the LLC form bestows upon its members. *See Bonedaddy's of Lee Branch, LLC v. City of Birmingham*, 192 So. 3d 1151, 1161 (Ala. 2015) ("Membership/ownership in an LLC . . . is not a basis for liability for debts of the LLC.  In fact, the limitation of such liability is one of the foundations of the Limited Liability statutes.  As a member and manager of the LLC, Mr. Cowan cannot be held personally responsible for actions of the LLC.").

Moreover, there exists no basis for "piercing the corporate veil" to hold 46 Entertainment liable for actions it took on behalf of Rock the South, LLC.  The Alabama Supreme Court recently reiterated the standard courts should apply when considering whether to lift the protection of the corporate form:

> "Piercing the corporate veil is not a power that is lightly exercised. The concept that a corporation is a legal entity existing separate and apart from its shareholders is well settled in this state. *Co-Ex Plastics, Inc. v. AlaPak, Inc.*, 536 So. 2d 37 (Ala. 1988). *Alorna Coat Corp. v. Behr*, 408 So. 2d 496 (Ala. 1981).  The mere fact that a party owns all or a majority of the stock of a corporation does not, of itself, destroy the separate corporate identity. *Messick v. Moring*, 514 So. 2d 892 (Ala. 1987); *Forester & Jerue, Inc. v. Daniels*, 409 So. 2d 830 (Ala. 1982).  The fact that a corporation is under-capitalized is not alone sufficient to establish personal liability. *Co-Ex Plastics, Inc. v. Alapak, Inc.*, *supra*; *East End Memorial Association v. Egerman*, 514 So. 2d 38 (Ala. 1987). To pierce the corporate veil, a plaintiff must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences. *Washburn v. Rabun*, 487 So. 2d 1361 (Ala. 1986); *Cohen v. Williams*, 294 Ala. 417, 318

So. 2d 279 (1975).

"....

"... Where the law recognizes one-man corporations, it is obvious that the law accepts the fact of domination by one person. *See . . . Co-Ex Plastics, Inc. v. Alapak, Inc.*, *supra.* Therefore, mere domination cannot be enough for piercing the corporate veil. There must be the added elements of misuse of control and harm or loss resulting from it. *Messick v. Moring, supra; Washburn v. Rabun, supra.*

"The corporate veil may be pierced where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation. *See, e.g., Forester & Jerue, Inc. v. Daniels, supra; Hamrick v. First National Bank of Stevenson,* [518 So. 2d 1242 (Ala. 1987)]; *Deupree v. Ruffino*, 505 So. 2d 1218 (Ala.1987); *Messick v. Moring, supra; East End Memorial Association v. Egerman, supra.*"

*Simmons v. Clark Equip. Credit Corp.*, 554 So. 2d 398, 400-01 (Ala. 1989).

*Childs v. Pommer*, – So. 3d. – , No. 1190525, 2021 WL 4022619, at *10 (Ala. Sept. 3, 2021) (ellipses and alteration in original). The record contains no evidence that Rock the South, LLC, failed to respect the corporate form in any of these guises. Stated simply, to recover for actions or omissions by Rock the South, LLC, or its agents, Hammett needed to sue Rock the South, LLC, and he did not do so.

In summary, Hammett did not work directly for 46 Entertainment, and no 46 Entertainment employee directed the activities of Hammett or the other Union contract workers. As 46 Entertainment did not reserve the right to control Hammett's activities

as a Union employee, it did not owe Hammett a duty to provide safe work conditions, and Hammett cannot recover from 46 Entertainment for any failure to provide such safe conditions.  *See Rosenthal v. JRHBW Realty, Inc.*, 303 So. 3d 1172, 1187 (Ala. 2020) (quoting *Parker v. Thyssen Mining Constr., Inc.*, 428 So. 2d 615, 618 (Ala. 1983)) ("'[W]here there is no duty, there can be no negligence.'") (alteration in original).

## B.  Hammett Abandoned His Argument that 46 Entertainment Owed a Duty to Warn Him of Unsafe Conditions

46 Entertainment argued in its summary judgment brief that it did not owe any of the duties Hammett identified in his complaint, including the duty to warn Hammett of dangerous and unsafe conditions.  However, in Hammett's response brief, he did not address 46 Entertainment's argument that it did not sustain a duty to warn him about dangerous or unsafe conditions.  Rather, he only argued that 46 Entertainment owed him a duty to provide a reasonably safe work environment.

The failure of a party to oppose an issue in a pending motion may constitute an abandonment of the claim challenged by the issue.  *See, e.g., Coal. for the Abolition on Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court renders the claims abandoned); *Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (concluding that a plaintiff's failure to respond to arguments regarding certain claims in a defendant's motion to dismiss resulted in dismissal of those claims as abandoned).  By declining to respond to 46 Entertainment's arguments regarding his claims for failure

to warn, Hammett impliedly heeded the merits of 46 Entertainment's contentions regarding those claims. *See, e.g., Edmondson v. Bd. of Trs. of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007) (finding that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned") (citing *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). The court thus finds Hammett abandoned his negligence claims based upon the duty to warn him of unsafe conditions, and will grant summary judgment in 46 Entertainment's favor on those claims.

Even if Hammett did not abandon his duty to warn claim, there exists no evidence to support the claim. In Alabama,

> an """owner of premises is not responsible to an independent contractor for injury from defects or dangers which the contractor knows of, or ought to know of."" *Ex parte Meadowcraft Indus., Inc.,* 817 So. 2d 702, 706 (Ala. 2001) (quoting *Glenn v. United States Steel Corp.,* 423 So. 2d 152, 154 (Ala. 1982), quoting in turn *Veal v. Phillips,* 285 Ala. 655, 657-58, 235 So. 2d 799, 802 (1970)). Moreover, "'[t]here is no duty to warn' . . . an independent contractor 'who has equal or superior knowledge of a potential danger.'" *Fielder v. USX Corp.,* 726 So. 2d 647, 650 (Ala. 1998) (quoting *Alabama Power Co. v. Williams,* 570 So. 2d 589, 592 (Ala. 1990)). Rather, a premises owner's duty to warn arises when the owner is aware "'of dangers that are hidden on or inhere in that property.'" *Farr Metal, Inc. v. Hines,* 738 So. 2d 863, 864 (Ala. 1999) (quoting *McGregory v. Lloyd Wood Constr. Co.,* 736 So. 2d 571, 575 (Ala. 1999), ultimately quoting *Gulf Oil Corp. v. Bivins,* 276 F.2d 753, 758 (5th Cir. 1960) (emphasis omitted)). A party claiming that a duty to warn existed must show: "(1) that the defect or danger was 'hidden'; (2) that it was 'known to the owner'; and (3) that it was 'neither known to the contractor, nor such as he ought to know.'" *Meadowcraft,* 817 So. 2d at 706 (quoting *Glenn v. United States Steel Corp.,* 423 So. 2d at 154).

*Roberts v. NASCO Equip. Co.*, 986 So. 2d 379, 383-84 (Ala. 2007) (alteration and ellipsis in original).

There exists no evidence that 46 Entertainment owned the premises on which Hammett received his injury.  46 Entertainment did not produce the festival, and it did not own the real property on which the festival occurred, the truck Hammett unloaded, the ramp he used, or the loading dock he approached.  Moreover, as discussed above, no 46 Entertainment employee controlled the unloading process.  Accordingly, even if Hammett did not abandon his argument that 46 Entertainment owed a duty to warn him of potential dangers, he could not succeed with that argument because he cannot demonstrate 46 Entertainment owned or controlled the premises.

## II.    Hammett's Wantonness Claim Cannot Survive Summary Judgment Because 46 Entertainment Did Not Owe Hammett a Duty of Care

Hammett's complaint alleged 46 Entertainment breached its duties of care to him in a wanton manner by:  wantonly failing to reasonably operate, maintain, manage, and inspect the workplace; wantonly failing to warn him of the condition of the equipment and the process for unloading; wantonly failing to inspect; and wantonly creating an unsafe and hazardous condition.  (Doc. 1, at 6-7, ¶¶ 23-24).

Alabama law defines wantonness as "'the conscious doing of some act or the omission of some *duty,* while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" *Dolgencorp, Inc. v. Taylor*, 28 So. 3d 737, 745 (Ala. 2009) (emphasis in original) (citations omitted).  Thus, "a wantonness claim arising from the alleged omission of a duty fails as a matter of law when no such duty exists." *Gray v. L.B. Foster Co. Inc.*, 761 F. App'x

871, 875 (11th Cir. 2019) (citing *Dolgencorp, Inc.*, 28 So.3d at 746).   As previously discussed, 46 Entertainment did not owe Hammett any of the duties Hammett alleged. Therefore, Hammett's wantonness claim cannot survive summary judgment.

## CONCLUSION AND ORDER

For the reasons stated herein, even construing the record facts in the light most favorable to Plaintiff, Jason Hammett, Defendant 46 Entertainment, Inc., did not owe Hammett a duty to provide a safe work environment or to warn him of any potential workplace hazards.   Accordingly, Hammett cannot proceed to trial on either his negligence claim or his wantonness claim.   The court will grant 46 Entertainment's motion for summary judgment on both claims.

**DONE** and **ORDERED** this 29th day of October, 2021.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE